UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
UNITED STATES OF AMERICA,        :
        :
        Plaintiff,        :
        :        **OPINION AND ORDER**
        -against-        :        08-cr-860 (DLI)
        :
COURTNEY GEORGE MILLER,        :
        a/k/a "Martin David Morris," and        :
        "Ralph Nathan Stokes,        :
        :
        Defendant.        :
-------------------------------------------------------------------x

**DORA L. IRIZARRY, United States District Judge:**

Defendant Courtney George Miller is charged with use of a false passport and aggravated identity theft in violation of 18 U.S.C. §§ 1542, 1028A. On April 10, 2009, defendant moved to suppress incriminatory statements he made to agents of the United States Customs and Border Patrol ("CBP") and the Department of State ("DOS") on November 2 and 3, 2008, after his arrival at John F. Kennedy International Airport ("JFK").

For the reasons set forth more fully below, the court finds that the CBP's pre-*Miranda* warning interrogation was a routine administrative interview at a border entry point, and thus exempt from *Miranda*'s requirements. Even assuming otherwise, exclusion of defendant's confession obtained during the second interview conducted by the DOS is not warranted because that interview cannot be deemed part of a deliberate, two-step strategy to obtain the post-warning confession. Moreover, the *Miranda* warnings administered by the DOS effectively cured any potential defects. Thus, defendant's motion is denied in its entirety.

## I.  BACKGROUND

### A.  Motion to Suppress

Defendant arrived at JFK airport on November 2, 2003 on a flight from London and presented a passport in the name of Martin David Morris.  (*See* Def.'s Mem. of Law in Supp. of Mot. to Suppress Statements ("Mot.") at 1.)  He was escorted by a flight attendant to the CBP primary passport control area, where he was immediately referred to secondary review.  (Decl. of Courtney George Miller ("Miller Decl.") at ¶ 2.)  During the secondary review process, CBP officers Victor Marrero and Frank Umowski determined that defendant was not the real Martin David Morris, based on inconsistencies in the information provided by defendant and data from the criminal history for his purported identity.  (*See* Mot. at 1; Government's Mem. of Law in Opp'n to Def.'s Mot. ("Opp'n") at 3-4.)

Defendant contends that his initial interrogation lasted a few hours, but does not specifically challenge or even identify any questions not geared towards verifying his identity, stating only that he was "quizzed about [his] real identity."  (*See* Miller Decl. at ¶¶ 3-4.) Defendant further alleges that, after the examination concluded, he was fingerprinted and told by the CBP officer that he was going to be arrested as a "John Doe" because the CBP could not determine his true identity, and "for all they knew I could be a terrorist or something."  (Miller Decl. at ¶ 4.)  Although he was not handcuffed, defendant states it was made clear to him that he could not leave.  (*Id.*)

Defendant ultimately disclosed his social security number, which led to his true identity and discovery of an outstanding arrest warrant from the DOS for passport fraud.  (Miller Decl. at 5; *see also* Opp'n at 5.)  The CBP officer then transported defendant to a different airport building, where DOS Special Agent Eric Donelan placed the defendant under arrest, read the

defendant his *Miranda* rights for the first time, and gave defendant an opportunity to sign a *Miranda* waiver form. (Miller Decl. at ¶ 5-6; Opp'n at 6.) After the waiver form was signed, the DOS special agent proceeded to take defendant's confession in the presence of the CBP officer to whom defendant had disclosed his social security number. (Miller Decl. at ¶ 6; Opp'n at 6.) According to defendant, this second interview covered "much of the same subject matter" as the initial interview. (Miller Decl. at ¶ 6.) Although defendant provided details about his true identity and how he obtained a passport under a false identity, he was unwilling to make a written confession. (Miller Decl. at ¶ 6; Opp'n at 6-7.)

Defendant now contends that the initial CBP interview went far beyond the routine border questioning admissible without *Miranda* warnings, and asks the court to suppress incriminatory statements made during that interview. He further argues that subsequent statements made after he was provided *Miranda* warnings and interrogated by the DOS should also be excluded as part of a continuous interrogation meant to circumvent *Miranda*'s requirements. The government opposes, arguing that there is no basis for suppression of statements made in the initial CBP interview because that interview comprised a routine border inspection and was thus exempt from *Miranda*'s requirements. The government further asserts that suppression of statements made to the DOS during the second interview is similarly inappropriate, because there is no allegation that defendant failed to understand his *Miranda* rights once they were administered, or that his waiver of those rights was not voluntary.

### B.  Evidentiary Hearing

On June 16, 2009, this court held an evidentiary hearing on defendant's motion. The government presented testimony from CBP Officers Victor Marrero and Frank Umowski, as well as DOS Special Agent Eric Doelan, all of whose testimony the court finds credible.

### 1. CBP Officer Victor Marrero

Officer Marrero testified that he has worked for CBP and its predecessor agency, the Immigration and Naturalization Service ("INS") for nineteen years. In November 2008, and on the date of the hearing, Officer Marrero was employed as a CBP Re-enforcement Officer whose primary function was to perform "secondary inspections," that is, to determine whether passengers arriving into the United States are eligible for admission after the CBP officers conducting primary inspection find that more in-depth admissibility inquiries are required. (Tr. at 5:13-23.)[1] Passengers may be referred to secondary inspection when they present potentially fraudulent documents, or have periods of unauthorized employment, criminal histories, outstanding arrest warrants, or other similar issues. (*Id*. at 5:6-6:2.) Officer Marrero indicated that he has conducted "thousands" of secondary inspections, which can take "minutes to hours," depending on the situation. (*Id*. at 8:14.)

According to Officer Marrero, verification of an individual's identity involves review of that person's travel documents, including passport, visas, or resident alien cards. (*Id.* at 7:12-8:8.) CBP officers also query various computer databases based on pedigree information (such as address) or other documents (such as a driver's license), to assess whether that individual has a criminal history or is the actual owner of the documents presented. (*Id*. at 7:12-8:11.)

Officer Marrero testified that he has never administered *Miranda* warnings or charged anyone criminally, nor are such tasks within the scope of his employment. (*Id*. at 6:3-7.) Any issues that arise during secondary inspection must be referred to the supervising officer for discussion with his or her superiors, who "determine what action will be taken." (*Id.* at 22:14-22.) Officer Marrero believes that the decision as to whether an individual should be charged

---

[1] "Tr." refers to the transcript of the hearing held on June 16, 2009.

criminally is made in consultation with the U.S. Attorney's Office by the CBP prosecution unit, to which he does not belong. (*Id.* at 6:9-16.) If the individual in question has an outstanding arrest warrant, the CBP officers determine whether they "are actually dealing with the right person," and then contact the warrant's originating law enforcement agency for pick up and arrest. (*Id.* at 19:22-20:5.)

On November 2, 2008, while on duty at JFK's Terminal Seven, Officer Marrero conducted a partial secondary inspection of defendant, who was known to him by the name on his passport, "Martin David Morris." (*Id.* at 10:2-22.) Passengers subject to secondary inspections in Terminal Seven sit on one of several chairs across from an officer sitting at a tall countertop with a computer. (*Id.* at 9:6-24.) Primary inspection Officer Bonifacio escorted defendant to the secondary inspection area at approximately 7:10 p.m. after discovering an outstanding arrest warrant for Martin David Morris. (*Id.* at 11:1-18.) Officer Marrero first ran a search in a computer database to corroborate Officer Bonifacio's findings. (*Id.* at 11:19-22.) He then took defendant's fingerprints to verify his identity, but found that the fingerprints did not correspond to any criminal history in the system. (*Id.* at 11:23-12:2.) From this, Officer Marrero inferred that defendant was not the Martin David Morris for whom there was an outstanding arrest warrant. (*Id.* at 12:3-5.)

Additional computer database searches, including passport and license queries, yielded further discrepancies. (*Id.* at 12:11-17.) For instance, defendant's passport revealed that he left the United States on January 27, 2008, whereas, according to the criminal history, Martin David Morris had been arrested twice, including once on January 27, 2008, and had been convicted while defendant was outside of the United States. (*Id.* at 16:2-7.) Both defendant's state identification card and driver's license were from Pennsylvania, and, like the rest of his

documentation, were acquired in 2007. (*Id.* at 14:10-15:13.) In contrast, the addresses reflected in the criminal history of Mr. Morris going back to 1990 were all from New York. (*Id.* at 16:9-17:9.) Since defendant presented documents bearing the same purported date and place of birth as the Martin David Morris named in the arrest warrant, Officer Marrero thought it unlikely that he was dealing with two different individuals by the same name. (*Id.* at 29:4-17.) Similarly, because all of defendant's documents were acquired in 2007, Officer Marrero found it improbable that defendant had been a victim of identity theft. (*Id.* at 30:15-31:1.)

Officer Marrero was released from his shift at 9:00 p.m., before he could ask defendant about any discrepancies. (*Id.* at 17:10-17, 26:18-23, 28:20-24.) Before leaving, he briefed CBP Officer Frank Umowski about the status of his review and his findings for completion of the secondary inspection. (*Id.* at 17:21-18:4.) He had no further contact with defendant or any other involvement in the case. (Id. at 18:5-10.)

### 2. CBP Officer Frank Umowski

CBP Officer Frank Umowski testified that he has worked for CBP for eight years, and is currently employed as supervisor of the Passenger Analysis Unit. (Tr. at 32:1-6.) In November 2008, he worked as a CBP officer assigned to the Alien Smuggling and Interdiction Unit, which is responsible for identifying high risk travelers before their entry into the United States. (*Id.* at 32:10-17.) As part of his training, Officer Umowski completed the Immigration Officer Basic Training course in 2001, as well as a ten-day course on passenger analysis and numerous courses on detection of fraudulent documents, all administered by the CBP. (*Id.* at 33:5-13.) He testified that he never charged anyone criminally or administered *Miranda* warnings as part of his responsibilities in the Alien Smuggling and Interdiction Unit. (*Id.* at 32:18-32-22.) To his

knowledge, the decision to impose criminal charges is made by a Criminal Enforcement Unit supervisor. (*Id.* at 32:23-33:2.)

On November 2, 2008, Officer Umowski reported to Terminal Seven at approximately 8:40 p.m. for his overtime shift with Passport Control Secondary Processing Unit. (*Id.* at 36:2-3, 34:6-7.) In secondary processing, CBP officers generally "determine admissibility [into the United States] of any arriving passenger whose inspection could not be completed on primary." (*Id.* at 34:15-16.) This can be accomplished "a number of different ways," including "look[ing] to verify subject's travel documents, various databases, verify prior terms of admission, was the passenger compliant to all terms of admission previously on travel. We look to verify criminal histories, open warrants." (*Id.* at 34:17-22.) Typically, individuals presented for secondary inspection are not restrained in any way. Officer Umowski estimated that, as of November 2008, he had completed over a thousand secondary inspections. (*Id.* at 35:3-5.)

Officer Umowski was instructed by the supervisor on duty in Terminal Seven to relieve Officer Marrero for the evening, and to continue Officer Marrero's work on "a possible false claim to U.S. citizenship currently being detained in secondary." (*Id.* at 36:2-7.) After discussing the case with Officer Marrero and conducting an independent review of the same information, Officer Umowski determined that "two individuals . . . appeared to be using this same identity." (*Id.* at 36:21-22.) For instance, Officer Umowski testified that defendant's U.S. passport under the name "Martin David Morris" listed his height as six feet, four inches, whereas "the criminal history associated with the identity Martin David Morris, same date of birth, as well as social security number, listed the owner of that criminal history was [*sic*] five foot seven [inches]." He also found that defendant had been outside of the United States for a period of ten

months, from January 27 to November 2, 2008, and that the person in the criminal history was incarcerated twice in that same period of time. (*Id.* at 37:1-13.)

Officer Umowski explained to defendant that "we had some questions as to who the true bearer of this [Martin David Morris] identity was," and that he would give defendant "an opportunity to prove . . . that he was the rightful bearer" of that identity. (*Id.* at 37:14-38:1.) According to Officer Umowski, Terminal Seven inspections are conducted in a large room, approximately thirty by twenty-five feet, containing close to forty seats. (*Id.* at 36:10-11.) The interview with defendant was conducted in a small room off that main area, approximately eight feet wide by ten feet long, containing one desk with a computer, with one chair on either side of the desk. (*Id.* at 53:4-8.) Although the door was open, defendant was not free to get up and walk out of the room, and would be escorted to the restroom as necessary. (*Id.* at 53:9-14.) Officer Umowski testified that he made inquiries regarding "when and where he was born, parents' names, any siblings, first known address, education, elementary school, middle school, high school." (*Id.* at 38:2-5.) Defendant was unable to substantiate his identity—"no contact with parents, or any family members, no recollection of addresses or education, schooling." (*Id.* at 38:14-17.)

After questioning the defendant, Officer Umowski was "quite confident" that the defendant was not Martin David Morris and so advised defendant. (*Id.* at 38:10-22.) When asked by defendant what would happen to him next, Officer Umowski responded that, if defendant continued to maintain that he was truly Mr. Morris, he would be detained and taken before an immigration judge, at which time the officers would present evidence proving that he was not the true bearer of that identity. (*Id.* at 38:23-25, 39:2-6.) He further explained that

defendant would be transported to a different terminal, where he would be placed in a holding facility until his hearing before the immigration judge. (*Id*. at 39:8-14.)

Officer Umowski also told defendant that if he provided his true name, date of birth and country of citizenship, he could be removed to his home country, or face criminal prosecution for the crime of fraudulent passport application. (*Id*. at 40:3-8; *see also id*. at 52:12-20.) The officer indicated that he "might have" said to defendant that he had to be careful "because [defendant] could be a terrorist or something," as "part of a larger statement." (*Id*. at 54:4-9.) Officer Umowski testified that he was not trying to influence defendant, but did want to describe his options. (*Id.* at 52:12-15.) When dealing with persons in possession of fraudulent documents, Officer Umowski endeavors to explain the importance of knowing their true identity, because while some attempt to enter the country for ostensibly benign purposes (e.g., to seek work), others may be criminals seeking to evade capture or terrorists. (*Id*. at 58:4-14.)

Defendant responded adamantly that he thought he would be prosecuted, so Officer Umowski gave defendant some time to consider how to proceed. (*Id*. at 40:9-25.) Shortly thereafter, defendant verbally gave the officer a sequence of nine numbers, which Officer Umowski recognized as a possible social security number. (*Id*. at 40:25-41:1.) The CBP's Passenger Analysis Unit confirmed that the social security number belonged to the identity Courtney George Miller. (*Id.* at 41:10-13.) Defendant acknowledged to Officer Umowski that this was his name. (*Id*. at 41:15-16.)

The National Crime Information Center ("NCIC") database showed an outstanding DOS warrant for Courtney George Miller. (*Id.* at 41:18-42:1.) Officer Umowski telephoned the DOS Command Center, and informed the officer on the phone that defendant "was in possession that day of another fraudulent[ly] obtained passport, and the identity Martin David Morris." (*Id.* at

55:20-56:4; *see also id.* at 42:23-43:9.)   He further told the officer that defendant "acknowledge[d] to me that his name was Courtney George Miller."  (*Id.* at 56:7-11.)  That officer, in turn, contacted Special Agent Eric Doelan, the agent on duty from the DOS New York field office.  Officer Umowski advised Agent Doelan via telephone that he had a person in custody with an active DOS arrest warrant who presented a fraudulent passport.  (*Id.* at 43:19-23.)  The two agreed to meet at Terminal Four, which would be open all night.  (*Id.* at 44:1-6.)

Officer Umowski conferred with the CBP supervising officer to apprise him of his findings concerning defendant, but did not discuss defendant's admissibility with any enforcement officers before transporting defendant to Terminal Four.  (*Id.* at 55:2-9.)  Defendant was restrained for transport by a pick up team, consistent with port policy requiring inadmissible aliens to be transported in restraints, in a vehicle, by at least two persons.  (*Id.* at 44:7-22.)  Officer Umowski estimated that he questioned defendant for roughly forty minutes, and that almost two hours lapsed in total between the commencement of his secondary inspection and the completion of transportation arrangements.  (*Id*. at 45:20-46:7.)  He testified that he did not make further inquiries as he waited with defendant for the Terminal Four pick up team, although defendant did express relief that he could again be known by his true identity.  (*Id.* at 45:2-11.)  Officer Umowski did not accompany defendant during transport, but arrived at Terminal Four almost simultaneously.  (*Id*. at 45:12-17.)  Restraints were removed upon arrival.  (*Id.* at 45:18.)

At Terminal Four, Officer Umowski briefed Agent Doelan on the case, expressing privately that defendant was "being very cooperative."  (*Id.* at 56:16-57:2; *see also id.* at 77:5-7.)  Officer Umowski witnessed but did not participate in the ensuing interview pursuant to CBP policy requiring CBP agents "to maintain [its] presence" any time an "outside agency is going to question a person that is in CBP's custody."  (*Id.* at 47:2-6.)  Agent Doelan placed defendant

under arrest and read defendant his *Miranda* rights from a *Miranda* waiver formed that defendant read and signed. (*Id.* at 47:12-17.) Agent Doelan subsequently questioned defendant for approximately twenty minutes to half an hour. (*Id.* at 48:21-25.) Office Umowski testified that the second interview did not involve any reference to the previous CBP interview conducted in Terminal Seven. (*Id.* at 49:1-8.) After Agent Doelan completed his examination, defendant was placed into a holding facility overnight to be interviewed the next morning by criminal enforcement officers. (*Id*. 49:9-13.) Officer Umowski indicated that he had no further contact with defendant. (*Id.* at 49:14-15.)

### 3. Special Agent Eric James Doelan

DOS Special Agent Eric James Doelan, who has held his title since about March 2005, testified that his day-to-day responsibilities include "passport and visa fraud investigations." (Tr. at 60:17-61:1.) Admissibility determinations play no role in his investigations. (*Id*. at 61:8-10.) His training includes approximately three and a half months at the Federal Law Enforcement Training Center and seven and a half months of additional training in Northern Virginia. Agent Doelan stated that the DOS is "basically a factfinder"—the agency collects facts and presents them to the U.S. Attorney's Office, which then decides whether to prosecute. (*Id.* at 79:3-9.)

On November 2, 2008, between 11:15 and 11:30 p.m., Agent Doelan received a telephone call from the DOS Command Center, advising that a person with a 1996 DOS warrant was detained at JFK. (*Id.* at 61:14-62:16.) Officer Umowski informed him via telephone that the DOS warrant listed the person's name as Courtney Miller, but that he presented a passport under the name Martin David Morris. (*Id*. at 62:19-25.)

After completing the call, Agent Doelan sent an e-mail to his supervisor, with the subject line "1996 John Doe warrant," stating that "[s]ubject apparently has a new passport as well and

has already confessed to CBP." (*Id.* at 75:2-9; *see also* Def. Ex. A.)  Agent Doelan testified that this did not refer to the new passport under the Martin David Morris identity, but rather meant that defendant had "confessed to an identity that matched a 1996 John Doe warrant." (Tr. at 75:10-13.)  Agent Doelan then went to JFK Terminal Four, arriving between 11:50 p.m. and 12 a.m., to meet Officer Umowski. (*Id.* at 64:7-17.)

Agent Doelan testified that, upon arrival, Officer Umowski told him that an individual presented a passport in the name of Martin David Morris, but that the CBP officers did not believe he was Morris.  Additionally, after he was questioned, the subject gave Officer Umowski a social security number belonging to Courtney Miller, who had a 1996 DOS warrant in the NCIC database. (*Id.* at 64:18-25.)  Agent Doelan reviewed the DOS system as well as the NCIC warrant, and contacted the DOS Command Center to request case notes from 1996. (*Id.* at 65:9-12.)  He decided to ask defendant initial questions to probe the facts, to make sure that he was, in fact the person wanted by the DOS pursuant the 1996 warrant for John Doe-Courtney Miller-Ralph Nathan Stokes (another alias). (*Id.* at 65:16-19; *see also id.* 67:4-8.)  He then intended to find out exactly how defendant acquired each of his aliases, and whether defendant believed that his false identities belonged real people. (*Id.* at 65:21-25; *see also id.* at 67:9-15.)

Agent Doelan asked Officer Umowski to accompany him because the officer knew the case, was the closest person available to witness the interview, and DOS guidelines require "at least two people in the room" during an interrogation. (*Id.* at 76:21-77:4; *see also id.* at 66:2-8.)  Agent Doelan noted that defendant was not restrained during the interview. (*Id.* at 66:9-14.)

To initiate the interview, Agent Doelan identified himself and Officer Umowski, and then read defendant his *Miranda* rights from a waiver form. (*Id.* at 67:21-68:2.)  Defendant indicated that he understood his rights, and signed the waiver form at approximately 12:34 a.m. (*Id.* at

68:1-23; 80:6-18.)  Subsequently, defendant admitted that his name is Courtney Miller, born on September 21, 1959, in Montego Bay, Jamaica.  (*Id.* at 69:10-12.)  Defendant told Agent Doelan that he first came into the United States in September 1993 on a K1 fiance visa to marry Maislyn Hogan, but the marriage failed because "[s]he was holding his K1 status over his head."  (*Id.* at 69:14-18, 70:2-7.)

With respect to the name on the 1996 warrant—Ralph Nathan Stokes—defendant knew Mr. Stokes "very well" through an ex-girlfriend, Rosetta Stokes.  (*Id.* at 71:1-5.)  Defendant told Agent Doelan that he did not purchase the name and identifiers or use them for financial gain, but, rather wanted the passport to visit his children in Jamaica.  (*Id.* at 71:5-7.)  Mr. Stokes was in prison when defendant appropriated his identity.  (*Id.* at 71:3.)  Defendant enrolled in John Jay College for an extended period of time under the name Courtney Miller, but "fled and went underground" when DOS agents tried to find him.  (*Id.* at 71:8-11.)

Defendant told Agent Doelan that he obtained the David Martin Morris passport from a person named Paul Perkins for travel, not for financial gain.  (*Id.* at 71:13-72:1.)  Defendant indicated that although he believed that Martin Morris was a real person and wanted to meet him, he was prevented from doing so by Mr. Perkins, who assured defendant that Martin Morris "was in no trouble because he lived with his mother."  (*Id.* at 71:13-22.)  Agent Doelan did not ask defendant how he knew the identity belonged to a real person, or why he wanted to meet him.  (*Id.* at 77:21-78:17.)  According to Agent Doelan, defendant also said that he had been living in the United Kingdom after acquiring the Martin David Morris identity, but was deported to the United States for overstaying the term of his visa after local authorities detained him during a traffic stop.  (*Id.* at 72:2-15.)

Agent Doelan testified that the interview concluded at around 12:52 a.m., when defendant refused to make a written statement reflecting these admissions. (*Id.* at 72:16-19.) According to Agent Doelan, this portion of the interview took about twenty minutes. (*Id.* at 73:2-7.) At around 1:10 a.m., Agent Doelan asked defendant for permission to examine defendant's cell phone, and also made additional inquiries regarding Paul Perkins. (*Id.* at 72:22-24.) During a brief discussion lasting no more than ten minutes, defendant told Agent Doelan that Perkins had driven him from the Bronx to Pennsylvania and supplied him with the information for Martin David Morris. (*Id.* at 72:19-73:14.)

Agent Doelan testified that neither he nor Officer Umowski make any reference to Officer Umowski's earlier interview. (*Id.* at 73:15-19.) He said that he did not make any promises to the defendant in exchange for his agreeing to speak with Agent Doelan, or attempt to pressure or coerce defendant to speak with him in any way. (*Id.* at 73:15-25.) He also testified that defendant did not request an attorney or ask that the interview stop at any time. (*Id.* at 80:19-25.)

## II. DISCUSSION

### A. Pre-*Miranda* Interrogation by the United States Customs and Border Patrol

Defendant claims that the initial statements obtained by the CBP should be suppressed because they were obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966.) The government responds that that the initial interview comprised a routine border inspection and is thus exempt from *Miranda*'s requirements.

The government has "plenary authority to conduct routine searches and seizures at the border, without probable cause or a warrant." *United States v. Flores-Montano*, 541 U.S. 149, 153 (2004). Border searches are reasonable "simply by virtue of the fact that they occur at the

border," pursuant to "the longstanding right of the sovereign to protect itself by stopping and examining persons and property crossing into this country." *United States v. Ramsey*, 431 U.S. 606, 616 (1977).

Routine questioning by custom officers at border entry points does not constitute custodial interrogation and therefore does not implicate *Miranda*. *United States v. Silva*, 715 F.2d 43, 47 (2d Cir. 1983) (holding that questions directed to a person's citizenship, the length and purpose of her travel, the items she was carrying and what she had to declare were routine questions necessary to protect the nation's borders and, thus, did not require *Miranda* warnings). The mere fact that a defendant is not forthcoming with his true pedigree information does not turn a routine admissibility interview into a non-routine interview. *See Tabbaa v . Chertoff*, 509 F.3d 89, 100 (2d Cir. 2007) ("[B]order crossers cannot, by their own non-compliance, turn an otherwise routine search into a non-routine one."). Similarly, the fact that a defendant's responses may have evidentiary value in the charges against him is, without more, insufficient to trigger a *Miranda* requirement when the questions answered are part of a routine immigration inquiry. *See United States v. Adegbite*, 877 F.2d 174 (2d Cir. 1989) (declining to suppress a defendant's admission that he was the person named in an arrest warrant, even where the admission would have evidentiary value in the case against him, because the agents were exercising prudence in asking the question before executing the warrant).

Defendant contends that he was in custody because the officers made it clear to him that he was not free to leave until the CBP officers ascertained his identity. He claims that he gave the uniformed agent his social security number "eventually, after much questioning." (Miller Decl. ¶¶ at 4-5.) These allegations do not raise any inference that the CBP officers acted outside the scope of their authority as admissibility officers to detain defendant until they could

determine whether defendant should be admitted in this country, particularly especially considering that defendant had been removed from the United Kingdom for overstaying his visa. *See* 8 U.S.C. § 1225(b)(2)(A) (providing an alien "shall be detained" unless the examining officer determines that he or she is "clearly and beyond a doubt entitled" to enter the U.S.); *see also Tabbaa*, 509 F.3d at 100 (holding that "CBP has clear statutory authority [under 8 U.S.C. § 1225(b)] to detain persons at the border in order to confirm their citizenship").

Defendant does not allege that the CBP officers questioned him as to matters beyond defendant's routine pedigree information. Indeed, he concedes that the initial interview consisted in sum and substance of being "quizzed about [his] real identity." (Miller Decl. at ¶ 4.) There is no evidence that Officer Marrero made any meaningful inquiries, or that he sought information beyond the usual sources employed by officers performing secondary examinations. (Tr. at 17:10-17; 26:18-23; 28:20-24.) The court also credits testimony from Officer Umowski that he explained to defendant that his goal was to ascertain "who the true bearer of this [Martin David Morris] identity was," and defendant had "an opportunity to prove . . . that he was the rightful bearer" of that identity. (*Id.* at 37:14-38:1.) The undisputed evidence shows that Officer Umowski's questions were geared solely toward determining defendant's true identity for admissibility purposes—"when and where he was born, parents' names, any siblings, first known address, education, elementary school, middle school, high school." (*Id.* at 38:2-5.) It is also undisputed that, once Officer Umowski identified defendant, all questioning stopped until Agent Doelan advised defendant of his *Miranda* rights and defendant waived those rights. (*Id.* at 45:2-11; 46:12-17.) The CBP officers' only duty is to determine admissibility and not to engage in the criminal investigation or prosecution of individuals. To the extent that defendant failed to

satisfy the officers about his identity, persistent questioning did not transform "an otherwise routine search into a non-routine one." *Tabbaa,* 509 F.3d at 100.

Defendant further objects to the admission of his statements to the CBP officers because he was allegedly subjected to undue pressure or coercion that led him disclose his real social security number. Specifically, he argues that Officer Umowski's statement that he would be arrested as "John Doe" because "for all they knew, I could be a terrorist or something" was designed to elicit an incriminating response and was not routine. This argument is without merit. The Second Circuit held in *Tabbaa* that a CBP examination was "routine" even where defendants were subjected to, and not just threatened with, "terrorist-style processing." 509 F.3d at 98-99. The search in *Tabbaa* was undisputedly "more rigorous than many of the secondary inspections given to people who arouse suspicion when attempting to enter the United States." *Id.* at 98. The court determined that

> While plaintiffs were undoubtedly made uncomfortable and angry by the searches, and they may understandably have felt stigmatized, their personal privacy was not invaded in the same way as it would have been had they been subject to a body cavity or strip search, or involuntary x-ray. Because the decisive factor in the analysis is invasiveness of privacy- not overall inconvenience-we find that CBP's searches of plaintiffs, considered in their entirety, were routine in the border context, albeit near the outer limits of what is permissible absent reasonable suspicion.

*Id.* at 99. Here, as in *Tabbaa*, there is no evidence that the CBP's examination unduly invaded defendant's privacy, limited as it was to inquiries regarding defendant's identity and general background. (Tr. at 38:2-5.). Thus, even if Officer Umowski said that defendant "could be a terrorist" in the officer's efforts to underscore the importance of identifying defendant, the CBP interview remains well within the ambit of what courts in this Circuit have deemed routine. (*Id.* at 54:4-9, 58:4-14.)

Finally, defendant argues that the CBP officer should have administered *Miranda* warnings as soon as he became convinced that defendant was not the real David Martin Morris, since any admission to that effect would cause defendant to proffer incriminatory information. Counsel noted at oral argument after the suppression hearing that defendant was referred to secondary inspection because there was an outstanding criminal warrant for the identity Martin David Morris; since defendant would be subject to such inspection whether he was U.S. citizen or not, the CBP examination "was purely about whether or not he was a person wanted on a warrant." (*Id*. at 85:2-4.) He argued that the CBP officers should have administered *Miranda* rights because they were "effectively a screen for the law enforcement unit to determine if they have a warrant, and determine initially if this is going to be a criminal case or potentially a criminal case or an administrative case that's going to be referred to an immigration judge." (*Id.* at 85:6-11.) The court disagrees.

The evidence clearly shows that defendant was detained because the officers suspected "a possible false claim to U.S. citizenship," in light of the discrepancies between the data available for admissible U.S. citizen Martin David Morris and the information offered by defendant. (*Id*. at 36:2-7.) Officers Marrero and Umowski credibly testified, and defendant does not dispute, that when they conduct secondary inspections, they have no authority to decide whether an individual will be arrested or charged. (*Id*. at 6:3-7; 22:14-22; 32:18-33:2.) Their function is simply to identify the individual, who is then referred to a supervisor who decides how to proceed, in consultation with the U.S. Attorney's Office. (*Id.*) Although defendant's admission of his true identity would obviously have evidentiary value, as it incriminated him in passport fraud, the goal of the CBP officers was not to obtain information to build a case against defendant, but rather to "determine admissibility [into the United States] for any arriving

passengers whose inspection could not be completed on primary." (*Id.* at 34:15-16; *see also id.* at 5:13-20.)  The agents were not required to give defendant *Miranda* warnings before making inquiries to ascertain defendant's true identity for these purposes.  *See Silva*, 715 F.2d at 47.

*Miranda* warnings were not required here even if, in addition to determining admissibility, the CBP officers also made efforts to assess whether defendant was the individual named in the outstanding arrest warrants for Martin David Morris and Courtney George Miller. (*See id.* at 12:3-5, 19:22-20:5, 34:15-22, 41:10-21.)  The CBP officers testified credibly that when they determine that an individual is named on a warrant, they attempt to confirm that they are in fact dealing with the named individual before contacting the warrant's originating agency. (*Id.* at 19:22-20:5; 42:23-43:9; 55:20-56:4.)  Indeed, defendant was not immediately arrested when he presented a passport in the name Martin David Morris, despite the outstanding warrant for that identity, because the officers did not believe that he was the person sought therein.  (*Id.* at 11:1-12:5; 38:10-22)  These types of inquiries get to the crux of the exception to *Miranda* for pedigree questions, that is, to allow officials to "to elicit routine information of a nature essential to facilitate the arrest and arraignment of the defendant."  *Adegbite*, 877 F.2d at 177.  The Second Circuit has deemed it prudent to "inquire as to the suspect's name to ensure that the wrong person is not apprehended."  *Id.* at 179 (internal quotation marks omitted).

### B.  Post-*Miranda* Statements to the United States Department of State

Defendant moves for suppression of his post-*Miranda* statements to the DOS because such statements "covered much of the same subject matter" as the initial, pre-*Miranda* statements, and the midstream *Miranda* warnings administered at the beginning of the second interrogation cannot cure the failure to provide them in the first.  He relies on *Missouri v. Seibert*, 542 U.S. 600 (2004), which holds that "[m]idstream recitation of warnings after interrogation

and unwarned confession" do not "effectively comply with *Miranda*'s constitutional requirement." *Id*. at 604 (refusing to admit statements where pre-warning interrogation elicited a full confession that was repeated after warnings were administered in a second interview, conducted in the same place by the same officer after only a short break).

The court finds that defendant knowingly and voluntarily waived his rights by signing the form and proceeding to make an oral statement. Defendant makes no allegation that he failed to understand his *Miranda* rights once they were administered, or that his waiver of those rights was not voluntary. (*See* Miller Decl. ¶¶ 6-7.) The undisputed evidence presented at the hearing demonstrates that Agent Doelan advised defendant of each of his rights by reading from a standard waiver form. (Tr. 67:25-68:2; 69:3-7.) The court credits the testimony of the agents that in each instance, defendant indicated that he understood his rights, and agreed to speak with Agent Doelan without being subject to pressure or coercion. (Id. at 48:13-18; 68:5-17; 73:20-25.) Such testimony is corroborated by the fact that defendant signed and dated the waiver form. (Government Ex. 7.)

Defendant's argument fails for three reasons. First, as discussed above (*see supra* Section II A), the absence of any *Miranda* requirements for defendant's admissibility interview at a United States border eliminates any plausible basis for suppression of his post-*Miranda* confession.

Second, there is no evidence here, as there was in *Seibert*, of a coordinated, deliberate, two-step strategy between the CBP and DOS officers to elicit a confession from defendant and sidestep *Miranda* requirements. Most importantly, the court credits testimony from Officer Umowski that he did not contact the DOS command center or discuss the case with Agent Doelan until *after* defendant had already made the pre-warning ostensibly incriminatory

statements involving his true social security number and name.  (*Id.* at 40:25-43:9.)  Logic supports this testimony—it wasn't until after defendant provided his social security number that Officer Umowski discovered the outstanding warrant for Courtney George Miller and had reason to contact DOS.  (*Id.*)  Thus, this situation is entirely different from the one before the Court in *Seibert*, where the police department had a "strategy of withholding *Miranda* warnings until after interrogating and drawing out a confession."  542 U.S. at 609, 615.

Third, Agent Doelan cured any potential defects by administering effective *Miranda* warnings before proceeding.  "[S]imple failure to administer the warnings, unaccompanied by actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will," does not so taint the investigatory process that "a subsequent voluntary and informed waiver is ineffective for some indeterminate period."  *Oregon v. Elstad*, 470 U.S. 298, 309 (1985) (admitting post-warning statements where police engaged in a brief exchange with defendant in his living room, apparently failing to give warnings as an oversight, and later provided the warnings and obtained a full statement at the station); *see also United States v. Carter*, 489 F.3d 528 (2d Cir. 2007) (admitting post-warning statements where the initial interview was brief and there was almost no overlap between pre-warning statement and the full confession he gave after he received warnings).

The United States Supreme Court has identified five factors for determining whether *Miranda* warnings delivered midstream are effective.  Those are:

> [1] the completeness and detail of the questions and answers in the first round of interrogation, [2] the overlapping content of the two statements, [3] the timing and setting of the first and the second, [4] the continuity of police personnel, and [5] the degree to which the interrogator's questions treated the second round as continuous with the first.

*Seibert*, 542 U.S. at 615.

These factors support a finding that defendant's post-*Miranda* statements are admissible. First, although defendant claims that the second interview covered much of the same subject matter as the first, there is no evidence that the first interview included questions beyond those routinely asked by CBP officers to identify an individual for admissibility purposes. (*See* Miller Decl. ¶¶ 3-4, 6; Tr. at 7:12-8:11; 34:17-22; 38:2-17.) Second, the only overlap between the statements involved defendant's disclosure of his social security number and name, which defendant was obligated to provide to gain entry into the United States. (*Id*. at 40:25-41:1; 41:15-17.) There is no evidence that the CBP officers made follow-up inquiries regarding defendant's true identity, or the *bona fides* regarding his possession of the fraudulent passport and identification documents, after defendant provided his real social security number and acknowledged his name. (*Id*. at 45:2-11.) Third, the second interview took place over an hour after the first, in a different terminal, and was conducted by a different officer from a different agency. (*Id.* at 36:2-3, 45:20-46:7, 64:7-17; Opp'n at 6); *see also Carter*, 489 F.2d at 536 (refusing to suppress post-*Miranda* warning statements obtained one hour after the pre-warning statements were made). Officer Umowski did not accompany defendant during transport between terminals, which also supports the view that there was a significant break between the two sessions. (*Id*. at 45:12-14.) Fourth, although Officer Umowski witnessed the second interview, that interview was conducted entirely by Agent Doelan. (*Id.* at 47:2-11; 67:16-68:2; 76:21-22.) Finally, the second interview did not involve any reference to the first. (*Id.* at 49:1-8; 73:15-19.) Therefore, these factors confirm that the *Miranda* waiver in this case was effective.

### III. CONCLUSION

For the reasons set forth above, defendant's motion is denied in its entirety.

SO ORDERED

DATED:      Brooklyn, New York
            July 21, 2009

                        _____/s/_____
                           DORA L. IRIZARRY
                        United States District Judge